## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ADAM CARMON,** | : | **PRISONER** |
| *Petitioner* | : | **CASE NO. 3:18cv1794(JCH)** |
| **V.** | : | |
| | : | |
| **WILLIAM MULLIGAN,** | : | |
| *Respondent* | : | **FEBRUARY 11, 2019** |

### <u>RESPONDENT'S RESPONSE TO MOTION FOR APPOINTMENT</u>
### <u>OF COUNSEL AND STAY OF THE PROCEEDINGS</u>

The respondent files this pleading in response to the January 28, 2019 motion for appointment of counsel and stay of proceedings filed on behalf of the petitioner in this 28 U.S.C. § 2254 proceeding by Assistant Federal Defender David S. Keenan. As Attorney Keenan represents in his motion, the undersigned indicated, in a telephone conversation, that the respondent takes no position with respect to the relief sought.  In fact, the undersigned informed Attorney Keenan that the Office of the Chief State's Attorney would never object to them seeking such appointment as it was entirely within the discretion of the Court.[1]

---

[1] Appointment of counsel for a financially eligible section 2254 petitioner in habeas corpus cases is discretionary, and that discretion should be exercised only when the interests of justice so require, unless an evidentiary hearing is required or appointment of counsel is necessary to conduct effective discovery. <u>See</u> Rules 8(c) and 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts; 18 U.S.C. § 3006A(a)(2)(B).  A motion for appointment of counsel in a habeas corpus action is analyzed in the same way as a motion for appointment of counsel in a civil action filed under 28 U.S.C. § 1915(e)(1). <u>See</u> <u>Moss v. New York</u>, No. 10-cv-5840(SJF), 2014 WL 585928, at *7 (E.D.N.Y. Feb. 12, 2014). The court must first determine whether the petitioner's claims have "some likelihood of merit." <u>Johnston v. Maha</u>, 606 F.3d 39, 41 (2d Cir. 2010) (<u>quoting</u> <u>Cooper v. A. Sargenti Co.</u>, 877 F.2d 170, 174 (2d Cir. 1989)).

To be clear, the respondent's position with regard to the appointment of counsel has not changed. That is, the respondent does not object to the appointment of counsel, and leaves the matter to the Court's discretion.   Nonetheless, the undersigned files this response to alert the Court to the fact that the specific grounds that Attorney Keenan cites as supporting appointment, particularly whether an evidentiary hearing or additional discovery is authorized in this case, or whether the petitioner's claims have a likelihood of merit, were never discussed.   In fact, it is the respondent's position that neither discovery nor an evidentiary hearing is authorized by statute in this § 2254 proceeding, given the nature of petitioner's claims and the state of the underlying state court record.   Most important, given the Connecticut Appellate Court's thorough, reasonable, and well-supported analysis rejecting petitioner's Brady and Strickland claims, they are without merit.   See Carmon v. Commissioner of Correction, 178 Conn. App. 356, 175 A.3d 60 (2017).

The respondent is mindful of counsel's need to demonstrate that petitioner's claims have "some likelihood of merit."   However, the undersigned is compelled to respond to the inappropriate attempt to establish a false narrative and improperly influence this Court on the ultimate issues, all under the guise of seeking appointment in this case. Counsel's improper interjection of irrelevant personal opinions on the credibility of state's witnesses, the gratuitous proffer of his perceptions of the former New Haven State's Attorney's understanding of his obligations under Brady, and reference to matters outside the record that have no bearing on this Court's proper application of § 2254 to this petitioner's case, are wholly inappropriate.

It is one thing to be a zealous advocate on behalf of a state prisoner.   It is another thing entirely to attempt to bolster petitioner's claims by cherry-picking through the voluminous underlying transcripts to mislead the Court by providing it with abject

distortions of the nearly twenty-five year old record.[2]  The interests of justice will not be served by the appointment of counsel who is not forthright with the Court about such basic matters as trial counsel's defense theory.   (As will be examined hereafter, Attorney Silverstein's "alternative theory of liability" at trial, was *never*, as counsel would have this Court believe, premised upon a third party culpability claim which featured Arthur Brantley as the shooter.  See Motion [ECF No. 11] at 4, 15.  Examination of Silverstein's closing argument, as well as his testimony at petitioner's state habeas proceedings reveals as much.)  If such distortions of the record as are set forth in the motion are allowed to permeate this entire case, the interests of justice will not be served. Instead, the respondent will be required to devote his limited time and resources to dismantling this false narrative, as he has had to here, and similarly, the Court will have to wade through the thicket as well.

### 1.  The statutory limitations on an evidentiary hearing and discovery

On October 31, 2018, the petitioner initiated the instant proceedings pursuant to 28 U.S.C. § 2254.  See ECF No. 1.  In his *pro se* petition, the petitioner raises three

---

[2]  To start, in attempting to bolster the appearance that there is merit to a third-party culpability claim that Arthur Brantley was the shooter, counsel tells this Court on four separate occasions that Brantley failed a polygraph examination.  See Motion [ECF No. 11] at 4, 7, 10, 15.  Admissibility and reliability issues aside, there was no evidence produced at petitioner's criminal trial that Brantley *actually* failed the polygraph examination that was administered to him.  Rather, careful review reflects that counsel's citations to the record are to Brantley's own testimony that *he was told* by New Haven detectives that he "failed the lie detector test."  As Brantley further testified, this and additional pressures exerted upon him by New Haven detectives (as well as by the victims' family) caused him to conjure up the fake story that he provided in his false statements.  As the record shows, this theme, that detectives lied and pressured potential witnesses (of which Brantley was held up by defense counsel as an example) was one prong of Attorney Silverstein's multi-pronged defense of the petitioner.

grounds upon which he claims he is held in violation of the Constitution, laws or treaties of the United States, to wit: (1) a claimed failure to disclose exculpatory information in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); (2) a claim that trial counsel and habeas counsel provided ineffective assistance of counsel under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984); and (3) actual innocence. <u>Id</u>. Each of those claims was addressed on the merits by the Connecticut Appellate Court.   See <u>Carmon v. Commissioner of Correction</u>, 178 Conn. App. 356, 175 A.3d 60 (2017).

Section 2254(d) sets forth the standard of review of habeas claims where the petitioner is "in custody pursuant to the judgment of a State court" and the claim at issue "was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). When the state court has considered a claim on the merits, federal court review is very deferential and is "limited to the record that was before the state court that adjudicated the claim on the merits." <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181, 182 (2011) ("Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas relief. It would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively <u>de</u> <u>novo</u>.") Thus, "evidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." <u>Id</u>. at 185.

The Supreme Court requires that the same deferential standard govern the decision whether to hold an evidentiary hearing. <u>Id</u>. at 183. "[W]hen the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not

required to hold an evidentiary hearing.'" Id. (quoting Schriro v. Landrigan, 550 U.S. 465, 474 (2007)).

Section 2254(e)(2) provides that the federal court may hold an evidentiary hearing where the petitioner has failed to develop the factual basis of his claim in state court if certain conditions are met. An evidentiary hearing is warranted only in two circumstances. First, if the claim relies on a new rule of constitutional law that has been made retroactive to cases on collateral review by the Supreme Court. 28 U.S.C. § 2254(e)(2)(A)(i). Second, the claim relied on a factual predicate that could not have been previously discovered through the exercise of due diligence. In either case, the facts underlying the claim must be sufficient to establish by clear and convincing evidence that, absent this constitutional error, no reasonable factfinder would have found the petitioner guilty of the charge. 28 U.S.C. § 2254(e)(2)(B).

The statutes are designed to "strongly discourage" petitioners from introducing new evidence in federal habeas proceedings and to "ensure that '[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." Pinholster, 563 U.S. at 186 (quoting Williams v. Taylor, 529 U.S. 420, 437 (2000)); see also Wainwright v. Sykes, 433 U.S. 72, 90 (1977) ("[T]he state trial on the merits [should be] the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative federal habeas hearing").  Petitioner Carmon's claims were decided on the merits by the Connecticut Appellate Court. Thus, this Federal Court's review is pursuant to Section 2254(d) and must be conducted based on the evidence available in the state court.

    **2.  The petitioner's <u>Brady</u> and <u>Strickland</u> claims have no likelihood of merit because the underlying factual record, viewed in its entirety, wholly supports the Connecticut Appellate Court's reasonable determination that the disputed evidence was not material and petitioner was not prejudiced by the alleged deficiency of counsel**

    **a.  the petitioner's crimes and the criminal trial**

In 1994, the state charged the petitioner, Adam Carmon, in connection with a shooting in New Haven that left an infant dead and her grandmother paralyzed from the chest down.  Following a jury trial in the New Haven Judicial District, wherein petitioner was represented by Attorney Richard Silverstein, the petitioner was convicted on the charges of murder, in violation of Connecticut General Statutes § 53-54a, assault in the first degree, in violation of Connecticut General Statutes § 53a-59(a)(1), and carrying a pistol without a permit, in violation of Connecticut General Statutes § 29-35.  On May 26, 1995 the trial court (*Hadden, J.*) sentenced the petitioner to a total effective sentence of eighty-five years' imprisonment.  <u>See</u> <u>State v. Carmon</u>, 74 Conn. App. 813, <u>cert</u>. <u>denied</u>, 244 Conn. 918 (1998).   In rejecting the petitioner's direct appeal, the Appellate Court set forth the facts underlying the petitioner's criminal conviction as follows:

> On the night of February 3, 1994, Charlene Troutman was in the living room of her apartment located on Orchard Street in New Haven waiting for a taxicab. With her, among others, was her seven-month old granddaughter.  Shots fired from the street passed through the living room window killing the granddaughter and leaving Troutman permanently paralyzed. At the time the shots were fired, Jaime Stanley and Raymond Jones were stopped at a traffic light near Troutman's apartment and saw a man firing into the apartment. As the shooter ran away, both Stanley and Jones saw his face. Both witnesses identified the [petitioner] during trial as the person who had fired the shots through the window of Troutman's apartment.

<u>State v. Carmon</u>, 47 Conn. App. at 815.

Stanley testified that she was the passenger in the car driven by Raymond Jones

when she witnessed the shooting. Trial Transcript (hereafter "TT") at 336-37, 339-44 (Appendix A). Stanley testified that she was about six feet from the shooting when it happened and had an unobstructed view of the gunman. Id. at 342, 343-44, 385, 466-67.  After she arrived at her destination on Dixwell Avenue, Stanley telephoned police to inform them that she had witnessed a shooting.  Id. at 344-45.  In response to her call, Stanley was picked up by an officer on the night of the shooting and brought to the New Haven police station to be interviewed regarding the shooting.  Id. at 345.  On the night of the shooting, Stanley was at the police station in the company of Detective Ralph DiNello.  Id. at 861 (DiNello testifying).  DiNello testified that, at the police station that night, Stanley looked at a suspect in the shooting, Arthur Brantley, and stated that it was "[p]ositively not him."  Id.

The police initially showed Stanley hundreds of photographs, from which she did not make a positive identification of the gunman.[3] Id. at 347, 353.  About three weeks after the shooting, Detective Anthony DiLullo brought Stanley to a New Haven courtroom. In the courtroom were over 100 people, most of whom were African-American. TT at 347-48; see also id. at 486, 487 (DiLullo testifying).  As soon as the petitioner, along with about fifteen other people, entered the courtroom to be arraigned

---

[3]   Detective DiNello testified that when Stanley viewed a photograph of the petitioner, Adam Carmon, she stated "[t]his looks very close, very similar."  TT at 862.  DiNello testified that Stanley indicated she preferred to see the person in person rather than by photo.  Id. at 862-63.  As Stanley explained at trial: "I didn't feel comfortable identifying somebody who is going to be tried for murder from a photograph.  It's too serious a matter.  I couldn't live with myself doing that.  I wanted to see the person in person."  Id. at 353-54.

on another matter, Stanley identified him as the shooter.[4] Id. at 349-51, 487.

Jones estimated that he was approximately eleven or twelve feet from the gunman at the time of the shooting. Id. at 1306. Jones testified that he had an unobstructed view of the shooter's face and that he had seen him in the neighborhood before. Id. at 1306-07, 1339, 1351, 1381. Jones identified the petitioner from photographs he was shown about two weeks after the shooting. Id. at 1311-12. He also identified him in court. Id. at 1310-12, 1313.

In addition to the two eyewitness identifications, the state presented evidence that the petitioner had possessed the gun used in the shooting before and after the shooting. Specifically, Anthony Stevenson testified that he saw the petitioner with a gun a few weeks prior to the Orchard Street shooting. Id. at 633. Stevenson further testified that, a few days after the Orchard Street shooting, he did a robbery with the petitioner. Id. at 591-92, 596-98. He described how, before the robbery, he watched the petitioner scrape the inside barrel of a gun with a screwdriver. Id. at 594-95. The petitioner then gave Stevenson the gun. Id. After the robbery, Stevenson was arrested, and the police matched the gun that the petitioner had given Stevenson to the gun used in the Orchard Street shooting. See id. at 655-66, 673.

Timothy McDonald, who, like the petitioner, was a member of the violent, drug-dealing Fifth Ward gang, testified that he sold a nine millimeter handgun to the petitioner

---

[4]  When asked whether there was any doubt in her mind about her identification of Adam Carmon as the shooter, Stanley replied "[a]bsolutely not." TT at 354.

before the Orchard Street shooting. TT at 519-20, 523-24, 540, 1473, 1483, 1492-93. McDonald identified the handgun recovered from Stevenson as the gun he sold the petitioner. Id. at 520-23, 539-40, 594-95.

The state also presented consciousness of guilt evidence. Both Jaime Stanley and Detective Anthony DiLullo testified that when the petitioner first saw Stanley in the New Haven courtroom where she identified him, he said "Oh, shit," put his head down, and tried to cover his face. TT at 429, 432-33, 488.

The defense countered with a multi-pronged attack. First, it tried to paint a picture of a group of detectives who, given the nature of the case, were under enormous pressure from their superiors and the media to arrest someone for murdering the infant victim. See, e.g., id. at 760, 771. Second, it attacked the methods used by the police, arguing that they were not thorough, pressured potential witnesses and supplied them with critical information, and even lied during their testimony. See, e.g., id. at 1439-41 (challenging manner by which police eliminated Anthony Stevenson as a suspect); id. at 1615-16 (arguing, in closing, "consider what we told you about, what you learn[ed] about the New Haven Police Department and their investigative techniques. Don't for a moment believe what the state's attorney stands up here and tells you[:] that New Haven police would not stand up here and lie."); id. at 864-66 (defense counsel accusing Detective DiNello of changing his trial testimony from that offered in connection with a motion to suppress); compare id. at 1022 (Brantley testifying that detectives told him he failed polygraph) with id. at 1091-92 (Detective DiLullo claiming he never told Brantley that) and id. at 1174 (different detective testifying that Brantley

9

was told that); id. at 1418, 1427 (prosecutor and trial court recognizing defense strategy of suggesting that detective was "fabricating his testimony"). Third, the defense challenged the reliability of the eyewitness identifications. TT at 358-401, 411-51, 456-69 (cross of Stanley); id. at 1320-63-59 (cross of Jones); id. at 1466-69, 1471-72, 1497-98 (putting on evidence to impeach Jones' credibility); id. at 1607-08 (noting inconsistencies in eyewitness identifications).

Finally, and most relevant to this action, the defense presented the testimony of Arthur Brantley. During Attorney Silverstein's direct examination of him, Brantley, who was apparently attending high school in 1994; TT at 999, 1006; testified that during the afternoon of February 3, 1994, he went to 810 Orchard Street to collect money that Richard Troutman and Charlene Troutman owed him for drugs. Id. at 962. After Richard Troutman told Brantley that he did not have the money, a fight ensued. Id. at 962-63. After the fight, Brantley went back to his home. Id. at 963.

Brantley further testified that during the early morning hours of February 4, 1994[5], the police visited him and took him to the police station. Id. at 963-64. After questioning Brantley for about two hours, the police released him. Id. at 965-66. Brantley also offered that, while he was at the police station on the night of the shooting, he was involved in an identification procedure. Id. at 964. That is, he was told that somebody was going to look at him to determine whether or not they could recognize

---

[5] The shooting at 810 Orchard Street occurred at approximately 10:30 p.m. on the night of February 3, 1994. TT at 105-06.

him.  TT at 964.[6]

The next day, the police picked Brantley up and brought him to the police station again. Id. at 966-67. After four or five hours, Brantley gave a statement in the presence of Detectives DiLullo and DiNello. Id. at 965, 967, 968, 971, 973. In the statement, Brantley, responding "Yes" to leading questions from the detectives, claimed that after the fight he wanted revenge and went to Fair Haven to get backup and a gun. Id. at 968, 971, 972. Brantley testified that after he gave the police that statement they allowed him to leave. Id. at 973.

Brantley testified that on February 7, DiNello picked him up and brought him to the police station yet again, where Brantley gave another statement. Id. at 974. In this statement, given after Brantley was at the station for between three and four hours, Brantley told DiLullo and DiNello that he was present at 810 Orchard Street when the shooting occurred. Id. at 975, 977. Brantley further claimed that Demetrius Bates and Anthony Little were responsible for the shooting. Id. at 976, 986-88, 995-96.

After Attorney Silverstein read Brantley's February 7, 1994 statement into the record, he asked whether the information contained therein was true. Id. at 999-1000. Brantley testified that it was not. See id. Silverstein concluded his direct examination of Brantley by asking whether Brantley believed he had been treated fairly by the police, to

_____

[6] As noted, Detective DiNello testified that the person that looked at Arthur Brantley at the police station on the night of the shooting was the eye-witness to the shooting, Jaime Stanley, who, upon looking at Brantley, stated it was "[p]ositively not him."  TT at 861.

which Brantley responded, "No, not really." Id. TT at 1000.

On cross-examination, Brantley expanded on why he believed the police had treated him unfairly. Specifically, the police woke him while he slept in his underwear; TT at 1001, kept him at the police station in a "little small room" for "long hours"; id. at 1000, 1002, 1003; and did not read him his Miranda rights until after he had given his statements. Id. at 1004. Brantley also explained that he was telling the truth when he initially denied any involvement, but changed his story after the police refused to believe him and after the police told him that the victims' family was trying to kill him and his mother. See id. at 1007, 1008, 1017-18, 1021, 1022, 1058. Brantley explained that he believed the story he concocted would shift the victims' family's anger away from Brantley and toward Bates and Little. Id. at 1023, 1048-49; see also id. 1047. Brantley admitted that he had nothing to do with the shooting, that he was not with Little that night, and that "Demetrius Bates" was fictional. Id. at 1024, 1026. He further acknowledged that the gun he described in one of his statements was not the gun that forensic analysis had established was used in the shooting. Id. at 1025. He explained how, once the police realized that someone other than Brantley had committed the shooting, they were "nice" to Brantley and admitted that they had made a mistake. Id. at 1027, 1028.

On redirect, Attorney Silverstein elicited from Brantley that, after he initially told the police that he was not involved in the shooting, the police relentlessly pressured him and told him that they knew he was involved. Id. at 1050. The police even told Brantley that they would not leave him alone until he "came clean." Id. Brantley responded by

"picking up pieces" of what happened from what the police were saying and making up a story that he thought would satisfy them. See  TT at 1050; id. at 1051 ("It was like they didn't want to hear [the truth]. But I had a witness, but the witness didn't identify me. They say: you still have something to do with it, or you hire[d] somebody, like I had something to do with it. I tell them I don't have nothing to do with it, they won't buy it, so I conjured up the story."); see also id. at 1017 ("Well, I told the truth the first time I was there, [the detectives] wouldn't believe me, tell me I am lying. . . . [The detectives] told me I was lying, then when the witness told [the detective] it wasn't me, he still tell me I had something to do with it, he proceeded to say that I did it and they gave me a lie detector test.")

On re-cross, Brantley again acknowledged that it was not just pressure from the police that led him to make up the story; it was pressure from the victims' family, as well. Id. at 1052. When the prosecutor noted that Brantley was not placing "all" of the blame on the police, Brantley replied, "Most of it." Id.; see also id. at 1056.

In closing argument, Attorney Silverstein spent limited time discussing Brantley's testimony. When Silverstein did reference it, he tried to fit it into the narrative that evidence obtained by DiNello and DiLullo could not be trusted because they pressured potential witnesses into saying things that were not true. For example, Silverstein argued:

> Police officers don't coerce testimony or witnesses. Police officers don't lie. Police officers are merely aggressive. That's all the state's attorney's argument. Police officers are merely aggressive.
>
> Arthur Brantley – I brought Arthur Brantley in regard to the three statements he gave. Arthur Brantley was taken down to New Haven PD,

and remember who interviewed Arthur? Apparently DiNello and DiLullo, because their testimony in this case is very important having to do with the identification procedures and circumstances that surrounded the ID, both at the arraignment court and during the photo arrays that were shown to Jaime Stanley. They bring down Arthur Brantley, wake him up out of bed the night this murder occurred, they had information he was involved in a fight earlier that day. They bring him down and Arthur immediately said "I have nothing to do with it." Arthur Brantley does not say, gee, let me tell you, I had something to do with this murder, let me give you a 29-page statement saying I was at the murder scene, that I observed the shooter, that here are the names of the shooters. Arthur Brantley says none of that. Arthur Brantley goes down, says I have nothing to do with this murder, I was there earlier in the day, but I did not return any time that night. They showed Arthur Brantley to Jaime Stanley, she said no, that's not him. Is the New Haven Police Department satisfied? No.

The next day they take Arthur Brantley to Meriden and give[ ] him a lie detector test, and on the way home they told him: you failed with flying colors, you better come clean with us about what you know about this murder because you were there. If you didn't do it, you knew somebody. Give me another four hours. Just aggressive police work. They sweat it out with Brantley. I don't know if you hear[d] of that Humphrey Bogart movie. It doesn't make it less true. They have had him down there for four hours, seven hours, five hours. These are the same officers who came over here, sit over there, tell you: we did not influence Arthur Brantley at all. We did not pressure Arthur Brantley at all. Arthur Brantley came to us to give us this testimony, to give us this statement to help in our investigation. Arthur Brantley, a 21-year-old black male comes down to the New Haven Police Department six hours to speak to middle-aged white New Haven police officers and detectives and is not pressured at all.

When they finally get what they want out of Arthur Brantley, which is a statement implicating himself in this case and naming other individuals, when they finally get that, based on what Arthur has told them, despite the fact that Arthur told them he had nothing to do with this and [he] has been eliminated by Jaime Stanley, they applied for a search and seizure warrant … of Anthony Little's house, they go before a judge and they swear that the information contained in that warrant is truthful, and contained in that warrant is probable cause that Anthony Little is involved in a murder or that there is evidence in Anthony Little's house, and they go out and they tell you that only after they find Anthony Little that he has got an alibi of some type and there is no weapon found at Anthony Little's house so they stopped going in that direction.

No. That is not the case. Because between the issuance of that warrant Anthony Stevenson is found with what the state claims is the murder weapon. [Wh]oops. Rewrite. Guess Arthur Brantley may have been telling us the truth initially. I guess Arthur must be a flake. Arthur is not a flake. *Arthur was coerced by those members of the New Haven Police Department who [were] not satisfied when Arthur went down there and told them the truth.* Does it make sense that Arthur is going to name the drug guy he works for as being involved in this case in order to [avoid] retaliation from other people? What do you think the guy he works for, Anthony Little, is going to think about Arthur sticking him in this murder? He's not going to be upset with Arthur? He's not going to place himself in danger of retaliation in that direction?

Well, they found the gun and they say that pretty much ends that theory of the case we had; time for us to look in at another area and, you know, it's funny because when they go to Arthur's house to take that last-three page statement, when they said it's a mistake, I'm sorry, they apologized to Arthur. Why do you apologize to Arthur? Why do they apologize to Arthur? Are you apologizing to Arthur for giving those pages of lies and wasting of man-hour[s]? Why would you apologize to Arthur? The only reason you would be apologizing to Arthur is *if they did Arthur wrong*, *and they did*. But DiNello and DiLullo were the individuals who interrogated Arthur and they would have you believe that they didn't pressure Arthur in any way, shape or form. Think about what you know about human nature and ask yourselves whether or not you believe for a minute that those members of the New Haven Police Department, when they had poor Arthur Brantley down there on the second floor of One Union Avenue, whether or not Arthur felt a little pressured when they tell him that he's a walking dead man and he better come clean in this case on what he knows because they are not going to let up on him.

(Emphasis added.) TT at 1592-96.[7] The closest that Silverstein came to asserting a

third-party culpability defense was the following, wherein Silverstein still linked Brantley

---

[7] See also TT at 1168-69 (Silverstein, in argument before trial court, appearing to argue that Brantley's testimony was relevant because it "raises serious questions in regard to the believability and credibility of Detective DiLullo, the fact that he claims that they did nothing to pressure Brantley."); id. at 1185 (Silverstein stating that, in closing argument, "I'm not going to talk about polygraph[s] and their reliability. I was only going to refer to the fact that they brought tremendous pressures to bear on Mr. Brantley there, urging that he continue to make changes in his statement.").

to the purported abuses of the New Haven police:

> There is no motive. And then the state wants, on one hand to fight tooth and nail any testimony about drugs going on at 810 Orchard Street, and on the other hand, they want to ploy [sic] that testimony to provide some type of motive. The only one who had a motive was Mr. Brantley.
>
> I tell you one thing about Mr. Brantley, it took a great deal of courage for Arthur to come down here. He wasn't under subpoena. I went to get him. He didn't want anything to do with this case. He felt abused by members of the New Haven Police Department. Whether or not Arthur Brantley knew anything about the attack, or knew any of the attackers that evening, it's something for you to determine. But there is something that you have to note about the statement and the testimony that was entered: he gives a very detailed statement. Whether or not there is any truth to it, that's something you are going to be asked to determine. However, the police believed it enough to go there with a search warrant. I don't know whether or not they have proved in court reasons why all of a sudden they discredit him other than finding the weapon on somebody else. That doesn't quite fit in with what they had decided actually happened based on Arthur Brantley.

TT at 1612-13.

### b. Silverstein's testimony at petitioner's first habeas trial

Approximately seven years after the petitioner's criminal trial, Silverstein offered the following testimony at the petitioner's first habeas trial, which provided a bit more context for his use of evidence related to Brantley during the criminal trial:

> [Question]:   You had a theory that you pursued regarding Mr. Brantl[e]y's statements which gave an alternate theory to the jury?
>
> [Silverstein]: I didn't want them to believe Mr. Brantl[e]y did that murder, okay, but it was nice having a red herring to throw to the jury, okay. There's no doubt it was established that Arthur Brantl[e]y didn't kill that child or shoot the grandmother. What it was good for – I wasn't going to argue that he did it. It just gave the jury something else to focus on instead of my client. I wasn't going to argue that Arthur Brantl[e]y did a murder.

See First habeas trial transcript 5/10/02 at 32 (Appendix B).

16

### c. Silverstein's testimony at petitioner's trial on his fourth habeas

Nearly fourteen years after the petitioner's first habeas trial, Attorney Silverstein had occasion to testify again at the petitioner's trial on his fourth habeas.  Silverstein testified that he was aware that Brantley had given a statement in which he implicated himself in the shooting at 810 Orchard Street. See Trial Transcript in Fourth Habeas 12/8/15 (hereafter "4HT") at 33 (Appendix D). Silverstein used that statement at trial. Id. at 33-34. When asked whether it was "fair to say that [he] w[as] trying to establish a third party culpability defense," Silverstein responded, "I don't know," and then explained that the statements Brantley gave implicating himself were "not accurate, not the truth…." 4HT at 34. On cross-examination, Silverstein explained that he had received evidence from the State's Attorney's Office that eliminated Brantley as a potential suspect. Id. at 43-44. Nevertheless, Silverstein "wanted to get [Brantley's] statement in front of the jury where he admitted the murder," as a "kind of … a red herring." Id. at 44.

When asked whether he had a copy of the February 11, 1994 police report signed by Detective Robert Benson (which indicates that the latent prints lifted from an empty ammunition tray, located at 806 Orchard Street on the morning after the shooting at 810 Orchard Street, were identified as having been made by Arthur Brantley) during the criminal trial, Silverstein responded, "No I can't recall a specific memory of that report and I can't recall – *I really couldn't say whether I had the report*. I tend to think I didn't *merely because* I didn't bring it to the jury's attention." (Emphasis added). Id. at 37; see also id. at 36 ("I don't recall being given that police report."). When asked

whether he "could have received the report," Silverstein replied: "I don't remember receiving that report that's all I can tell you. I can't speculate as to why or I could or couldn't, I just don't remember." Id. at 45.

### d.  The Connecticut Appellate Court's decision

Based upon the entire undistorted record, the Connecticut Appellate Court, on appeal from the trial on petitioner's fourth state habeas, flatly rejected the petitioner's actual innocence claim, succinctly stating:

> The fingerprint analysis report proves that Brantley's fingerprints were on an empty ammunition box that was located outside a church that was near the crime scene. It proves nothing more than that. The petitioner was tied to the firearm that was used in the shooting by more than one of the state's witnesses. He was positively identified by two eyewitnesses to the shooting, and one of those witnesses stated that she was positive that Brantley was not the shooter. We conclude that the habeas court properly determined that the petitioner failed to establish that he was actually innocent.

Carmon v. Commissioner of Correction, 178 Conn. App. at 372.

Further, the Appellate Court affirmed the decision of the state habeas court which held that the fingerprint analysis report, which demonstrated that Brantley's fingerprints were on the ammunition box found in front of a neighboring church[8], was not material

---

[8]  "The shootings had occurred at 810 Orchard Street. The parking lot of a church was located next to 810 Orchard Street. The church itself was located at 806 Orchard Street, the next building beyond the parking lot. The cartridge box was located in front of the church." Carmon v. Commissioner of Correction, supra, 178 Conn. App. at 363 n.4, citing Carmon v. Commissioner of Correction, 114 Conn. App. 484, 489 n.3, 969 A.2d 854 (2009).

under Brady. As the Court explained:

> The [habeas] court stated that it had conducted a "lengthy review of the entire record of two decades of litigation, including previous court decisions, trial transcripts and numerous exhibits ...." Furthermore, it had reviewed the "eyewitness testimony, statements from the petitioner, and ... reasonable inferences [that could] be drawn therefrom ...." On the basis of this record, the habeas court concluded, in relevant part, that its confidence in the verdict was not undermined; the petitioner had received a fair trial. We agree with that assessment.

> Following our own review of the record, we conclude that the petitioner has failed to prove that the fingerprint analysis report was material. First, although Brantley had been an early suspect in the shooting, and his fingerprints were found on the ammunition box, it was known that he had been in that area hours prior to the shooting and that he engaged in a physical altercation at the crime scene. Second, there is no evidence that the shooter had with him an ammunition box at the crime scene or that the shooter had dropped or discarded such a box outside the nearby church. Third, there also was no evidence that anyone saw the shooter load a weapon while standing at or near the neighboring church. Fourth, there were two eyewitnesses to this shooting, both of whom came forward and positively identified the petitioner as the shooter. Fifth, the evidence at the petitioner's criminal trial demonstrated that one of those eyewitnesses, Stanley, was approximately six feet from the shooter and that she had an unobstructed view of the shooter; when she was shown a photograph of Brantley during the police investigation, she stated that she was positive that the person depicted in that photograph was not the shooter.[9]

> Finally, there was evidence that tied the petitioner to the firearm that had been used in the shooting. Timothy McDonald, a former member of the "Fifth Ward" gang[10] testified that the petitioner also had been a member of that gang, and that he knew the petitioner by the name "Twenty." During the criminal trial, McDonald was shown the firearm that had been used in

---

9   The reasonable inference to be drawn from the testimonies of both Arthur Brantley (TT at 964) and Detective DiNello (TT at 861), is that, more than just viewing a photograph, Stanley actually had an opportunity to look at Brantley in person at the police station on the night of the shooting.

10   [footnote 5 in original] The Fifth Ward gang was described at the petitioner's criminal trial as a violent "drug selling gang," involved with a "lot of guns ...."

the shooting, and he identified it as a firearm he previously had possessed. McDonald further testified that he had sold that firearm to the petitioner for $200, months before the shooting.

In addition to McDonald's testimony, another witness at the petitioner's criminal trial, Anthony Stevenson, who also had been a member of the "Fifth Ward" gang, testified that, after the shooting, the petitioner had been in possession of the firearm used in the shooting, and that the petitioner had given him the firearm to use in an unrelated crime. It was from Stevenson that the police recovered the firearm when responding to this unrelated matter.

On the basis of our independent review of the record, we agree with the habeas court that the petitioner failed to prove that the fingerprint analysis report, which demonstrated that Brantley's fingerprints were on the ammunition box found in front of a neighboring church, was material. The existence of this report, even if improperly suppressed by the state, does not undermine our confidence in the verdict.

Carmon v. Commissioner of Correction, 179 Conn. App. at 367-69.

Likewise, because the petitioner failed to establish materiality under Brady of the fingerprint analysis report, petitioner could not establish that he was prejudiced under Strickland by the alleged deficiency of trial counsel in failing to present the fingerprint analysis report.  Id. at 370.

## CONCLUSION

For the reasons cited herein, neither an evidentiary hearing, nor discovery, are warranted in this § 2254 proceeding.  Determining whether the interests of justice require the appointment of counsel, and whether the petitioner's claim have some likelihood of merit, are matters which are at the discretion of the Court, taking into consideration the entirety of the underlying record.  Toward that end, the respondent has appended the complete transcripts from petitioner's underlying criminal trial

(Appendix A), as well as from his three state habeas trials (Appendices B, C and D respectively), for the Court's reference.

Respectfully submitted,

WILLIAM MULLIGAN,
RESPONDENT

By: /s/ DAVID M. KUTZNER
DAVID M. KUTZNER
Senior Assistant State's Attorney
Civil Litigation Bureau
Office of the Chief State's Attorney
300 Corporate Place
Rocky Hill, Connecticut 06067
E-mail: david.kutzner@ct.gov
Tel. No. (860) 258-5887
Fax No. (860) 258-5968
Federal Bar No. ct  08123

## **CERTIFICATION**

I hereby certify that on February 11, 2019, a copy of the foregoing Respondent's Response to Motion for Appointment of Counsel and Stay of the Proceedings was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System. Particularly, I hereby certify that a copy of the foregoing document was mailed, first class postage prepaid, to Adam Carmon, Inmate No. 170101, MacDougall-Walker Correctional Institute, 1153 East Street South, Suffield, Connecticut  06080 and to Assistant Federal Defender David S. Keenan, 265 Church Street, Suite 702, New Haven, Connecticut  06510.

    /s/ DAVID M. KUTZNER
DAVID M. KUTZNER
Senior Assistant State's Attorney